**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION AT MEMPHIS**

OLIVER DOUGLAS SHAW,

    Plaintiff,

v.   Case No.: _____

UNITED STATES OF AMERICA,
UNITED STATES OF AMERICA, d/b/a
Veterans Affairs Medical Center – Memphis, a/k/a
VA Hospital - Memphis

    Defendants.

## COMPLAINT

### INTRODUCTION

COMES NOW, Plaintiff, Oliver Douglas Shaw, individually, pursuant to the amendments to the Tennessee Healthcare Liability Act particularly T.C.A. 29-26-101, *et seq.* effective October 1, 2008, in compliance with the Federal Tort Claims Act ("FTCA") sections 1346(b) and 2671-2680 title 28, United States Code and brings this Health Care Liability action for his individual claims. Plaintiff is bringing this action against the Defendants, United States of America and United States of America d/b/a Veterans Affairs Medical Center – Memphis, a/k/a VA Hospital Memphis, for the violations of the medical standard of care that occurred in Shelby County, Tennessee beginning in November of 2018 and first discovered, at the earliest, on December 2, 2018, consisting of acts and omissions of medical negligence by the medical personnel/staff providing medical care, treatment and services to Plaintiff, Oliver Douglas Shaw at the Memphis VA Medical Center located in Memphis, Shelby County, Tennessee.  These violations of the medical standard of care occurred in Memphis, Shelby County, Tennessee in November of 2018 and were first discovered, at the earliest, on December 2, 2018, consisting of acts and omissions

constituting medical negligence that were the direct and proximate cause of the personal injuries, deterioration of health that Mr. Shaw has suffered.  At the time of the alleged acts and omissions giving rise to this Health Care Liability action the care providers including those identified in this Complaint upon information and belief were employees, agents, servants and/or representatives of the Defendants, United States of America and United States of America d/b/a Veterans Affairs Medical Center – Memphis, a/k/a VA Hospital - Memphis and provided medical care, treatment and services to said Defendants' patient, Plaintiff, Oliver Douglas Shaw.

**PARTIES, VENUE AND JURISDICTION**

1. At all times pertinent to this matter Plaintiff, Oliver Douglas Shaw was a resident of the state of Tennessee, legal citizen of the United States of America and veteran of the United States Military.  Mr. Shaw is a veteran citizen of the United States of America and as such was entitled to receive health care at the Memphis VA Medical Center.

2. All of the medical care, treatment, and services giving rise to this cause of action were provided to Oliver Douglas Shaw at the Memphis VA Medical Center and rendered by the medical personnel/staff of said Defendants as set out below and later identified or discovered in the medical files, charts and records of Oliver Douglas Shaw maintained by the Defendants' custodians, agents, servants, employees and representatives.  Therefore, all medical care and treatment was provided in Memphis, Shelby County, Tennessee.

3. The Defendant, United States of America is a governmental entity that among other things has taken on the responsibility of providing medical care, treatment and services to its veterans/patients who have served in the Armed Forces at various medical facilities known as VA Medical Centers and/or VA Hospitals.  This Defendant, United States of America d/b/a Veterans Affairs Medical Center – Memphis owned and operated the medical facility known as Memphis VA Medical Center located in Memphis, Shelby County, Tennessee and engaged in the business

of providing medical care, treatment and services to its veterans/patients including Plaintiff, Oliver Douglas Shaw by employing and contracting with physicians, residents, nurses, technicians, assistants, therapists, specialized skilled medical professionals, medical personnel/staff and administrative staff.  Therefore, any act or omission of medical negligence on the part of the care providers of Oliver Douglas Shaw, if they are found guilty, should be imputed to the named Defendants, United States of America and United States of America d/b/a Memphis VA Medical Center under the legal theory/doctrine of *Respondeat Superior* based on the employee, servant, agent and/or representative relationship of the medical care providers with the United States of America and United States of America d/b/a Memphis VA Medical Center.  Defendants may be served with service of process as directed on the Summonses issued in this Cause.

4.  Plaintiff further alleges that an agency relationship existed between all of the care providers of Oliver Douglas Shaw, while at the Memphis VA Medical Center, with the named Defendants in their duties and responsibilities as the care providers of the veterans/patients based on the employees, agents, servants and/or representatives relationship therefore any act or omission of medical negligence on the part of any one care provider of Oliver Douglas Shaw, if found guilty, should be imputed to the other care providers, included but not limited to the care providers identified in this Complaint, under the legal theory/doctrine of *Respondeat Superior*.

5.  All medical care and treatment applicable to Plaintiff's cause of action against the named Defendants, their agents, servants, employees and/or representatives being the care providers of Oliver Douglas Shaw occurred at the Memphis VA Medical Center or outlying VA Clinics in Memphis, Shelby County, Tennessee and was provided by the treating medical personnel/staff, employees, agents, servants, and/or representatives of the United States of America and United States of America d/b/a Memphis VA Medical Center.

6. Venue and jurisdiction are proper before this Court based on the original and exclusive jurisdiction conferred by the FTCA. This is a FTCA claim arising from acts or omissions constituting medical negligence that occurred in Memphis, Shelby County, Tennessee. Additionally, this Complaint is filed pursuant to the FTCA, section 1346(b) *et seq*. Title 28, U.S.C. which provides that a tort claim that is administratively denied or that has failed to be denied within 6-months may be presented to a Federal District Court for judicial consideration, and therefore presents a Federal Question. Such a suit must be initiated within six months after the date of the mailing of the notice of final denial as shown by the date of this letter (section 2401(b), Title 28 U.S.C.). Previously, Plaintiff filed his FTCA claim by letter dated October 15, 2020 sent via FedEx, that date, to the Office of Regional Counsel, Region 8 Nashville and was received by the noticed care provider, as documented by the FedEx tracking on October 21, 2020, signed for by M. Kennedy. The Office of General Counsel for the Department of Veterans Affairs and the Memphis VA Medical Center were also copied on the October 15, 2020 correspondence and were sent via regular mail to their respective addresses. Further, Plaintiff received a letter dated November 16, 2020, from the VA, confirming receipt of the October 15, 2020 correspondence as of October 23, 2020. Therefore, it has been longer than 6-months since Plaintiff presented his claims to the VA and his claim has not been denied by the VA within the 6-months. As such, Plaintiff, Oliver Douglas Shaw is electing to bring suit at this time.

7. Plaintiff alleges that this Court has jurisdiction of this Cause pursuant to the FTCA, Title 28, U.S.C. section 1346(b) *et seq*. and this Court's pendent or supplemental jurisdiction pursuant to 28 U.S.C. 1367 *et seq*.

8. Plaintiff, Oliver Douglas Shaw is exercising his right to file suit in accordance with the FTCA, Sections 1346(b) and 2671-2690, title 28 U.S.C., which provides a tort claim that is administratively denied by or has not been denied within 6 months of receipt may be presented to

4

a Federal District Court for judicial consideration with said suit to be initiated within six months after the date of the mailing of the notice of final denial.

9. Plaintiff avers that he has complied with state law requirements for commencing a health care liability action by having fully complied with the Health Care Liability Act, T.C.A. 29-26-121 and T.C.A. 29-26-122, as evidenced by the filing of the appropriate documents and pleading with the Court. Specifically, pursuant to T.C.A. 29-26-121 a Certificate of Mailing is attached along with the Affidavit of Christopher W. Lewis who mailed the notice letters. Additionally, pursuant to T.C.A. 29-26-122 the Certificate of Good Faith is also filed contemporaneously with this Complaint.

10. Plaintiff will further show that the kind of injuries he has sustained were foreseeable and preventable and would not have occurred except for the acts and omissions constituting medical negligence on the part of the named Defendants, their agents, servants, employees and/or representatives in their individual and joint medical care and treatment of Oliver Douglas Shaw as set out herein.

11. This is a Complaint for Health Care Liability alleging medical negligence on the part of the named Defendants, their agents, servants, employees and/or representatives, being the care providers of Oliver Douglas Shaw at the Memphis VA Medical Center at Memphis, Shelby County, Tennessee resulting in the personal injuries, and the deterioration of health that would not have otherwise occurred but for the negligence on the part of the care providers as set out more fully in this Complaint.

**FACTS**

12. On or about August 23, 2018 Mr. Shaw had an MRI of his brain/head. This MRI did not show any acute processes in Mr. Shaw's brain or head but it did note some disc changes at C3-C4 and that an MRI of the cervical spine may be of help. On September 19, 2018, Mr. Shaw

5

underwent an MRI of his cervical spine without contrast. This MRI demonstrated spondylitic spinal stenosis and cord compression at C3-C4 and mild cord edema or myelomalacia at this level and borderline spinal stenosis at C4-C5. Following the MRI of Mr. Shaw's cervical spine, Mr. Shaw saw his PCP Dr. Pushpunshu, M.D.

13. Dr. Pushpunshu is noted to have referred Mr. Shaw to neurosurgery for a consultation. Dr. Pushpunshu's note indicates that he made a comment on this referral that Mr. Shaw be seen the week of September 24, 2018. Yet, Mr. Shaw was not noted to be seen by neurosurgery until October 16, 2018. Dr. Pushpunshu noted that Mr. Shaw should undergo this surgery because it is very important, if he does not he can lose functions of his upper extremities. Mr. Shaw was seen by neurosurgery and it was determined that Mr. Shaw would undergo an anterior cervical discectomy and fusion. Mr. Shaw's surgery was scheduled for November 16, 2018. Prior to surgery Mr. Shaw underwent presurgical clearance on November 13, 2018.

14. Mr. Shaw underwent the ACDF on November 16, 2018. The procedure was noted to be performed by Dr. Michael Muhlbauer, M.D., as the attending and Dr. Vincent Nguyen, M.D. as the resident. The medical records indicate that Dr. Muhlbauer was present and scrubbed for all critical portions of the procedure. The record indicates that the procedure that was performed was a C3-5 anterior cervical discectomy and fusion. The records do not indicate any complications and note that one 10-french, round JP drain was placed. On November 17, 2018 the medical records indicate that Mr. Shaw was suffering from a prevertebral hematoma with 50% stenosis of his airway and that Mr. Shaw was suffering from dysphagia secondary to retractor use.

15. On November 18, Mr. Shaw was noted to be having inspiratory breathing difficulties by Dr. Miklos Molnar. Dr. Molnar noted that he was concerned Mr. Shaw's breathing problems may be related to his hematoma and ordered a Stat CT of Mr. Shaw's neck. At 05:57 pacific time Dr. Robert Reuter, M.D., on the 18th, called and informed Melissa Seemster, one of

Mr. Shaw's caregivers that Mr. Shaw's CT demonstrated prevertebral tissue thickening from C3-C6 consistent with hematoma and there was an associated narrowing of the airway by up to 50%. Subsequently, Dante L. Villarin, BSN, RN noted that at 23:50 patient's respiratory status became worse, with complaints of dyspnea and panic. Nurse Villarin noted that Mr. Shaw's heart rate and blood pressure became elevated and his oxygenation decreased into the 80's. Nurse Villarin then documents that Mr. Shaw momentarily stopped breathing and that resuscitation had to be initiated with ambu bag and that the MOD was called. It is also noted that Mr. Shaw began spontaneously breathing again.

  16. Dr. Molnar noted at 09:11 on November 18 that he received report of the CT of the Neck and that it indicated a compressing hematoma. Dr. Molnar also noted that he informed Dr. Dacus of neurosurgery of Mr. Shaw's CT results. Dr. Dacus is noted to have instructed Dr. Molnar to call him back if Mr. Shaw's oxygenation levels dropped below 98%. At 09:47 on the 18th, Sharron D. Jones, RRT noted that Mr. Shaw was administered a breathing treatment and that prior to the breathing treatment Mr. Shaw's O2 sat was 96% and then after the treatment Mr. Shaw's O2 sat was 100%. RRT Jones also noted crackles and that Mr. Shaw had a medium amount of thick bloody secretions. At 09:54 Dr. Nguyen and Dr. Sorenson noted that Mr. Shaw was having increasing difficulty swallowing and handling secretions yesterday evening. They went on to note that Mr. Shaw was breathing comfortably now and that he was having difficulty swallowing and that his voice was hoarse and wet sounding.

  17. Later on the 18th, it is noted by Jennifer Rust that the MD desires IV nutrition in lieu of NGT due to degree of trauma at this time. Ms. Rust also noted that Mr. Shaw was strict NPO at this time. Dr. Molnar next saw Mr. Shaw at 14:05 and noted that Mr. Shaw's breathing improved significantly and that Mr. Shaw feels better and that he discussed with Mr. Shaw and his family the potential causes of his difficulties. Dr. Molnar also noted that neurosurgery does not

feel Mr. Shaw's hematoma is significant. Gloria Goree noted at 15:55 that Mr. Shaw's O2 sats were 94% on RA. Stella Hoy documented at 15:59 that Mr. Shaw was having difficulty breathing, had coarse breath sounds, and that gurgling sounds were heard in the upper respiratory/throat area. Mr. Shaw's next note was made by Dr. Daniel Ryan Wells, M.D. and notes at 22:38 Mr. Shaw's lungs were clear his O2 sats were 98% and that there was no upper airway noise. Dr. Wells also noted Mr. Shaw to be completely stable.

18. On November 19, 2018 at 03:15, Dr. Wells noted that Mr. Shaw's lungs had some inspiratory rhonchi indicative of airway congestion. Dr. Wells also noted that Mr. Shaw was using suction well and that Mr. Shaw sounds overall better than yesterday per nursing.

19. Mr. Shaw is noted to have been transferred down to a step-down unit on November 20, 2018. At 13:11 on the 20th a geriatric consult note documented that Mr. Shaw had 2 episodes of shortness of breath ("SOB") within last 24-hours, that he is able to be managed with breathing treatments. The note also indicates that due to ongoing acute medical issues involving his hematoma and episodes of SOB as well as dysphagia and NPO status that Mr. Shaw was not a good candidate at that point of time for rehab.

20. On the 21st of November Mr. Shaw's medical records underwent a modified barium swallow ("MBS") test. The test indicated that Mr. Shaw had aspirations with all consistencies and tube feedings to be started. Also on the 21st, John H. Robertson documented at 10:32 that Mr. Shaw's JP drain was removed a short while ago. Subsequently at 19:00, Thormara Gayden noted that she received a call from radiology indicating that the NGT was in the right lung. Ms. Gayden noted that the NGT was placed by the previous shift and that RT was on the unit administering a breathing treatment to Mr. Shaw. She also noted that she paged neurosurgery and that Dr. Dacus answered her page and informed her reinsert the tube and check placement again.

21. At 20:45 on the 21st, Ms. Gayden documented that she paged Dr. Dacus again and that she reported to Dr. Dacus that Mr. Shaw had stridorous and coarse breath sounds. She also documented that Mr. Shaw was not in distress and that he was receiving a breathing treatment and suctioning. Further Ms. Gayden documented that Mr. Shaw's O2 sats were 95% on RA and that she requested and Dr. Dacus agreed to hold trying to replace Mr. Shaw's NGT until tomorrow. Ms. Gayden also documented that she was to inform the neurosurgery team of Mr. Shaw's status.

22. Later on the 21st around 22:00, Peter David Snell noted the following regarding Mr. Shaw. He noted that Mr. Shaw's NGT was found to be in his lungs and was removed immediately and that tube feeds would be held overnight. Dr. Snell noted that the primary team could decide tomorrow whether to reattempt the NGT. He also noted that speech recommended possible other long-term feeding options. Dr. Snell also documented at 02:15 on November 22, that Mr. Shaw's vitals were RR of 22; O2 sats 96% on RA; and his BP was 154/101.

23. Mr. Shaw's records further indicate that Margueta Abraham documented that she paged Dr. Nguyen at 10:59 on the 22nd. She noted that she paged Dr. Nguyen about Mr. Shaw's feeding tube. She went on to indicate that Dr. Nguyen instructed her to place a flexiflow tube, get a chest x-ray and start feeding.

24. At 14:51 on the 23rd of November, it is noted that Dr. Nguyen and Dr. Stephanie L. Einhaus documented their findings regarding Mr. Shaw from that time. They noted that Mr. Shaw denied any SOB or chest pains today. They also documented that Mr. Shaw still had a sore throat, was talkative but hoarse. They documented that Mr. Shaw's O2 sats were 94-96% on RA. They also documented that Mr. Shaw's sensation in his left upper extremity was improved.

At 23:55 on the 23rd Jacque Bates Robinson noted that RT was paged to Mr. Shaw's BS because the patient was having a hard time. She also noted that Mr. Shaw was suctioned and his HR was

decreased and his O2 increased. Ms. Robinson noted that Mr. Shaw's O2 sats were 98% and that she suctioned a large amount of thick yellow secretions.

25. Ms. Robinson also documented on Mr. Shaw on the 24th at 17:11. She noted that she gave Mr. Shaw a breathing treatment and he had an O2 sat of 98%. It was also noted that she was paged because Mr. Shaw was having a hard time with secretions and that he had audible wheezes. Ms. Robinson also documented that she suctioned a large amount of thick yellow secretions. It was documented at 22:08 by Khalid Najib that Mr. Shaw complained of SOB and that he had diminished breath sounds. It was also documented at this time that Mr. Shaw's vitals were HR 116; RR 26; BP 120/76 and O2 sats 96%.

26. On the 25th of November a portable chest x-ray noted that Mr. Shaw had bibasilar atelectasis without acute cardiopulmonary process. At 01:04 on the 25th, Stella Hoy noted that Mr. Shaw was having difficulty breathing but his 02 sats were within normal limits ("WNL") and his RR was WNL too. Ms. Hoy also noted that Mr. Shaw was using accessory muscles to breath and that he was in slight distress and discomfort. She also noted that the MOD was assessing Mr. Shaw at this time. She also documented at 02:04 that Mr. Shaw was having difficulty breathing. Khalid Najib noted that Mr. Shaw voiced complaints of SOB and that Mr. Shaw did not desaturate overnight. He noted that Mr. Shaw's vitals were HR 109; RR 14; BP 131/83 and O2 sats of 96%. Nurse Hoy next noted coarse breath sounds continue at 07:54.

27. At 10:40 on the 25th Dr. Einhaus made a neurosurgery note. She documented that Mr. Shaw was still myelpathic as excpected and that his wound looked okay. She also documented that Mr. Shaw had probable right superior laryngeal nerve palsy causing swallow dysfunction. Dr. Einhaus noted that this was secondary to probable stretch from a retractor and could take days to weeks to recover.

28. At 14:23 on the 25th Stephanie Evans from speech pathology documented regarding Mr. Shaw. She noted that Mr. Shaw had rhonchi bilaterally per nursing and that he was having difficulty tolerating his own secretions and using oral suction frequently. She noted that Mr. Shaw continued to have a breathy vocal quality, profound dysphagia and that Mr. Shaw was to remain strictly NPO with alternative means of nutrition.

29. Later at 14:32 Dr. Marwan A. Odeesh documented that Mr. Shaw was complaining of mild difficulty breathing and had gurgling sounds in the oropharynx when he attempted to speak. Dr. Odeesh went on to note that Mr. Shaw had coarse rhonchorous breathing sounds during inspiration and expiration. It was noted that this was heard bilaterally in all four lung zones anteriorly and posteriorly. Dr. Odeesh noted Mr. Shaw's vitals as follows: HR 105; RR 22; BP 126/75 and O2 sats 92-96% on RA.

30. Dr. Odeesh next documented regarding Mr. Shaw's care at 23:51 on the 25th. It was noted that Mr. Shaw had no SOB. It was also documented that Mr. Shaw feels like he's aspirating with increased gurgling sounds in the oropharyngeal and coarse breathing sounds.

31. On the 26th of November Mr. Shaw was noted to be transferred to the geriatric service. It was also noted on the 26th by Austin Jacob Wise and Jeffrey M. Brint that Mr. Shaw had no further issues with his hematoma. At 12:06 on the 26th Julie Farrar, in a pharmacy note indicated that per discussion with IDT will proceed with PEG placement. Ms. Farrar went on to note that Mr. Shaw's hospitalization has been complicated by postsurgical swelling of airway and difficulty to swallow or clear secretions. At 23:02 Dexter Blackburn documented that Mr. Shaw had a 96% O2 sat on 2L of O2 via binasal cannula (BNC).

32. At 11:42 on November 27 Austin Jacob Wise and Jeffrey M. Brint documented that they discussed Mr. Shaw's soft collar use with neurosurgery. They documented that the soft collar

11

should only be worn for transfers and when working with PT or OT. They also documented that the prevertebral hematoma with airway compromise had resolved.

33. On the 28th of November at 09:06 Dr. Nguyen and Dr. Einhaus documented that Mr. Shaw was breathing comfortably on RA, talkative and hoarse. They also documented that speech evaluation indicates that Mr. Shaw will likely need a PEG tub. In addendum note they indicated that if Mr. Shaw does not do well with another MBS they would recommend placing a PEG tube.

34. At 11:07 on the 28th, Austin Jacob Wise and Jeffrey M. Brint documented that Mr. Shaw was not feeling well enough to work with PT today. They also documented that they consulted IR for PEG placement and that IR was concerned regarding Mr. Shaw's WBC. They went on to note they ordered a CT of the abdomen and pelvis and of the neck because of SOB. At 11:38 Sevee Patterson noted Mr. Shaw was feeling SOB and that an albuterol treatment was given. It was also documented at this time that humidified O2 was in use at 2L via BNC and Mr. Shaw's O2 sats were 97%.

35. At 12:45 on the 28th Tyrone Cobb documented that Mr. Shaw was off the floor to CT. At 12:52 David W. Gray, PTA documented that Mr. Shaw declined his TF due to SOB and that Mr. Shaw remained supine. Mr. Gray also documented that Mr. Shaw's SOB was hindering his progress. At 16:41 Aisha Renee Anderson, RRT noted that she entered Mr. Shaw's room because he was known to be unable to mobilize his secretions and required periodic suctioning. She also noted that Mr. Shaw did not have any rhonchi.

36. On the 29th of November Mr. Shaw was noted to be transferred to MICU because he developed respiratory distress. At 03:42 Claudia Carr noted blood in Mr. Shaw's yanker from overuse. At 08:17 on the 29th it was noted that Mr. Shaw requested that the NG tube be removed because it was making his throat sore. It was also noted at this time that Mr. Shaw's voice was

hoarse with rhonchorous upper airway sounds and coarse sounds in BLL. Later at 11:19, Julia Rebecca Jones noted Mr. Shaw underwent another MBS and it indicated Mr. Shaw should remain NPO. Ms. Jones also recommended alternative means of nutrition and that the head of the bead remain elevated. She also documented that Mr. Shaw was aspirating his salvia.

38. At 16:53 on the 29th Pamela Pointer documented her nursing shift assessment of Mr. Shaw. She noted that Mr. Shaw's respirations were even and unlabored, that he denied SOB and that he was on RA. Nurse Pointer next documented at 19:10 and she indicated that she gave 1 carton of nepro feeding via the right nare of Mr. Shaw's NGT with 240cc of free water as ordered. She notes that this was tolerated well.

39. At 20:26 Aisha Renee Anderson, RRT documented the following. She noted that she reiterated to Mr. Shaw the importance of him pushing the call light for help when he feels he is "drowning" or struggling to breath. At 20:30 Juana Raidi noted that she was called by RT to check on the patient at BS. Nurse Raidi noted that Mr. Shaw was in acute respiratory distress; he had tachypneic breathing RR>35; he was tachycardic HR>128 and O2 sats<90% on RA. It was also documented at this time that Mr. Shaw had bilateral lung sounds that were wet and congested and that Mr. Shaw was placed on 5L of O2 via BNC. Nurse Raidi documented that on the 5L of O2 via BNC Mr. Shaw's O2 sats were 95% without any problem.

40. Subsequently at 21:27 David I. Williams, Pulmonary/Critical Care Fellow documented that Mr. Shaw had post-op laryngeal nerve palsy requiring NGT for feeding. Dr. Williams went on to note that by chart review Mr. Shaw has had loud rhonchorous upper airway sounds for a bit but tonight was having significantly more respiratory distress with RR in the 30s. He also documented that Mr. Shaw had very loud breathing with a large amount of upper airway secretions. At 21:34, Aisha Renee Anderson, RRT noted that Mr. Shaw had rhonchi bilaterally, with a productive cough and that she suctioned him.

41. At 22:28 Marissa Mayores noted that Mr. Shaw was transferred from 5E via bed. She also noted that Mr. Shaw was on 5L BNC with stridor and labored breathing. Ms. Mayores also documented that the doctor was at the BS. At 22:47 Hubert Bass, noted rales bilaterally and that Mr. Shaw's HR was 117 and his RR was 22. Also, at this time it is noted that respiratory was called because of patient's increasing respiratory distress, with loud breathing and a large amount of upper airway secretions.

42. Nazih Isseh is noted to have accepted Mr. Shaw's transfer to MICU on the 29th. The transfer noted indicates that Mr. Shaw had very loud breathing with large amount of upper airway secretions, that were suctioned vigorously with improvement in sounds but no resolution of WOB. It is also noted that Mr. Shaw received an albuterol treatment and that the Chest x-ray did not show pneumonia, pneumothorax or PE. The transfer note also indicates that epi was given along with 125mg of solumedrol. It goes on to indicate that Mr. Shaw was placed on a non-rebreather with O2 sats of 82% that continued to worsen. The note also documents Mr. Shaw's vitals at 20:50 to be Temp. 98.9; P 128; RR 38; BP 176/82 with no pain.

43. On November 30, 2018 Dr. Michael Muhlbauer noted that Mr. Shaw was an expected significant risk for swallowing difficulties and aspiration. Dr. Muhlbauer went on to note that this was expected based on the ACDF procedure; prior strokes; larger anterior osteophytes and significant myelopathy.

44. Also on the 30th, Nazih Isseh and Muthiah P. Muthiah documented that they were unsure if the C3-C6 prevertebral hematoma on CTs from 11/17 and 11/28 was the cause of Mr. Shaw's respiratory distress. They also documented that neurosurgery was aware of Mr. Shaw's acute decompensation and that neurosurgery would evaluate for expanding hematoma. Dr. Nguyen also documented on the 30th. He noted that he didn't feel the decompensation was related to the

neck hematoma particularly this far out from surgery. He also noted that any small residual blood should have resorbed by now.

45.     Dr. Michael Jacewicz, M.D. assistant chief of neurology also documented in Mr. Shaw's record on the 30th.  He noted that neurosurgery reports that Mr. Shaw was not hoarse prior to surgery and significant retraction was used during the ACDF. Dr. Jacewicz went on to note that ST was concerned for some irritation of the recurrent laryngeal nerve. He also noted that from the neurosurgery comments there may be a mechanical reason for the dysphagia involving cranial nerves 9 and 10.  Dr. Jacewicz went on to note that MD desires IV nutrition in lieu of NGT due to the degree of trauma at this time.

46.     Mr. Shaw's medical records reflect that he also underwent PEG tube placement on the 30th. He was also intubated on this date by Patrick Higgins and Muthiah Muthiah. They documented that Mr. Shaw had acute respiratory failure requiring intubation and that they were unsure of the etiology (aspiration pneumonia v. pneumonia v. airway compromise from hematoma v. PE v. heart failure).

47.     Also on the 30th William Mangham documented regarding Mr. Shaw's condition. He noted that Mr. Shaw was found on the floor to be tachypneic without stridor and was intubated. Dr. Mangham went on to note that there was not a palpable hematoma and that he reviewed prior imaging. He documented that there was minimal hematoma visible on the two post-op CTs of the neck. Dr. Mangham also documented that he did not think neurosurgery intervention would be necessary and that the breathing issues were not likely attributable to the hematoma or other surgically correctable cause. In an Addendum Dr. Mangham went on to note that CT of the neck is reviewed with stable to reduced edema in area near ACDF and that he will follow up with radiology interpretation of the study.

15

48. On December 2, 2018 at 13:50 Dr. Muthiah P. Muthiah, staff physician noted that he felt the dysphagia was more related to cervical stenosis/radiculopathy, etc. causing nerve dysfunction which could likely improve. Dr. Muthiah also noted that there was no evidence of aspiration pneumonia.

49. Ultimately Mr. Shaw would be extubated and transferred to Harbor View Nursing and Rehab. Mr. Shaw remained at Harbor View until February 9, 2019, where he underwent rehabilitation. Mr. Shaw was able to have his PEG tube removed on October 29, 2019. Mr. Shaw to date continues to suffer from the complications from his November 16, 2018 ACDF procedure, which upon information and belief were caused by violations of the medical standards of care applicable to the providers noted herein and throughout Mr. Shaw's records.

50. It is the employment relationship between the care providers, as noted in the medical records of Claimant, Oliver Douglas Shaw and as noted herein that provided medical care, treatment and services at the VA Hospital -- Memphis and the Department of Veterans Affairs which forms the jurisdictional basis for the filing of this Federal Tort Claim and subsequent claims and lawsuit.

51. The Department of Veterans Affairs upon information and belief is the federal agency responsible for the employees, agents, servants, medical personnel and/or staff at the VA Hospital in Memphis, and it is the negligent acts and/or omissions of the employees, agents, servants, medical personnel and/or staff that provided medical care, treatment and services to Mr. Shaw as noted in his medical records and herein. Further, it is believed that all care providers were acting within the course and scope of their employment during the time frame set out herein that caused the severe personal injuries of a past, present and permanent nature. Therefore, the Department of Veterans Affairs is liable to Mr. Shaw for the foreseeable personal injuries he

16

suffered, under the legal theories and/or doctrines of *Respondeat Superior*, vicarious liability and/or agency principles.

## **TORTS-MEDICAL NEGLIGENCE AND DEVIATIONS FROM THE STANDARD OF CARE**

52. It is the claim of Mr. Shaw that the VAMC located in Memphis, Shelby County, Tennessee, by the acts and omissions of its treating physicians, medical personnel, staff, agents, representatives and/or employees to include, but not limited to the identified care providers in this Complaint and as otherwise may be determined or discovered from the medical records of Plaintiff, Oliver Douglas Shaw, maintained by the Defendants, United States of America, and United States of America d/b/a Memphis VA Medical Center, and others not yet known or identified from the medical records and that may be identified later, breached the standard of care for the medical community of Memphis, Shelby County, Tennessee and as such directly and proximately caused the tortious injuries and damages of a past, present and permanent nature that Plaintiff, Oliver Douglas Shaw, would not have otherwise sustained except for the negligent deviations from the standard of care on the part of the treating physicians, medical personnel, staff and/or employees being any and all care providers of Mr. Oliver Douglas Shaw (e.g. physicians, nurses, radiologists, technicians and otherwise) at the VA Medical Center in Memphis in the following particulars:

(1) Negligently failing to timely and appropriately address Mr. Shaw's complaints;

(2) Negligently failing to appropriately treat Mr. Shaw to prevent his decompensation;

(3) Negligently causing Mr. Shaw to have to be intubated on November 30, 2018;

(4) Negligently placing the retractors during Mr. Shaw's November 16, 2018 surgery causing or contributing to his dysphagia;

(5) Negligently injuring Mr. Shaw's right recurrent laryngeal nerve;

(6) Negligently failing to follow Mr. Shaw's doctor's recommendation for IV nutrition instead of a nasal gastric tube ("NGT");

(7) Negligently placing the NGT in Mr. Shaw's lungs on November 21, 2018;

(8) Negligently failing to timely treat Mr. Shaw's prevertebral hematoma, which was causing airway compression;

(9) Negligently contributing to Mr. Shaw's incomplete quadriplegic state;

(10) Negligently failing to identify and protect Mr. Shaw's right recurrent laryngeal nerve;

(11) Negligently failing to perform Mr. Shaw's urgent ACDF before November 16, 2018.

## INJURIES AND DAMAGES

53. As a direct and proximate result of the medical negligence on the part of the named Defendants, United States of America, United States of America d/b/a/ Memphis VA Medical Center, and said Defendants' employees, agents, servants, and/or representatives being the care providers of Plaintiff, Oliver Douglas Shaw at Memphis VA Medical Center and as otherwise may be determined or discovered from the medical records of Plaintiff, Oliver Douglas Shaw, maintained by the Defendants, United States of America, and United States of America d/b/a Memphis VA Medical Center, and others not yet known or identified from the medical records and that may be identified later, Plaintiff, Mr. Shaw sustained the following injuries and damages for which he seeks recovery:

    (a)    Unnecessary physical pain and suffering;

    (b)    Unnecessary emotional pain and suffering sustained;

    (c)    Past, present and future medical expenses that would not have been necessary but for the negligence;

    (d)    Loss of use of Mr. Shaw's extremities;

    (e)    Loss of enjoyment and quality of life;

  (f)  Unnecessary permanent impairment;

  (g)  Depression;

  (h)  any and all other relief as justice requires under the facts of the case.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Oliver Douglas Shaw, files this action for Health Care Liability against the Defendants, United States of America and United States of America d/b/a Memphis VA Medical Center and said Defendants' employees, agents, servants, and/or representatives being the care providers of Plaintiff, Oliver Douglas Shaw at the Memphis VA Medical Center, for compensatory damages for unnecessary pain and suffering, unnecessary emotional pain and suffering, and as otherwise noted above, in the amount of one million five hundred thousand ($1,500,000.00) dollars.

Respectfully submitted this 21st day of September 2021,

s/ Louis P. Chiozza, Jr.
Louis P. Chiozza, Jr., BPR# 8871
Christopher W. Lewis, BPR 031497
Attorneys for Plaintiffs
Law Office of Louis P. Chiozza, Jr. & Associates
230 Adams Avenue
Memphis, Tennessee 38103
Office: (901) 526-9494
Fax: (901) 526-9970
Emails: Lou@chiozzalaw.com
    Chris@chiozzalaw.com